**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE AMERICAN MEDICAL ASSOCIATION,
AMERICAN HOSPITAL ASSOCIATION, *et al.*,

      Plaintiffs,

          v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, *et al.*

      Defendants.

Civil Action No. 1:21-cv-03231

*AMICI CURIAE* **BRIEF OF HOSPITAL ASSOCIATIONS IN SUPPORT OF
PLAINTIFFS**

## <u>TABLE OF CONTENTS</u>                                                        <u>Page</u>

TABLE OF AUTHORITIES ................................................................................ ii

CORPORATE DISCLOSURE STATEMENT ................................................... v

STATEMENT OF IDENTITY AND INTERESTS OF *AMICI* AND AUTHORITY TO
    FILE ........................................................................................................... 1

ARGUMENT ..................................................................................................... 4

    I.     Introduction ......................................................................................... 4

    II.    The No Surprises Act's legislative history shows that Congress rejected
         the benchmarking approach that the Departments have adopted ........................... 7

         A.    Initial proposals for rate-setting and benchmarking were met with
              stakeholder input that rate setting would harm patients and
              providers. ........................................................................................ 8

         B.    In the final No Surprises Act, Congress eliminated benchmarking
              or preference for median contracted rates to determine the payment
              amount .......................................................................................... 14

    III.   The Departments' regulations, if allowed to stand, will harm patients and
         providers ......................................................................................... 19

    CONCLUSION .......................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*NRDC v. Adm'r, EPA,*
902 F.2d 962 (D.C. Cir. 1990) (per curiam), *vacated in part,* 921 F.2d 326
(D.C. Cir. 1991) ...................................................................................................20

*Util. Air Regulatory Grp. v. EPA,*
573 U.S. 302 (2014) ..........................................................................................7, 20

**Statutes**

No Surprises Act, 42 U.S.C. § 300gg-111 ......................................................... *passim*

§ 300gg-111(a)(1)(C)(iii), (3)(H)(ii) ...............................................................18

§ 300gg-111(a)(1)(C)(iii), (a)(1)(C)(iv), (a)(3)(H), (a)(3)(K), (c) ...........................16

§ 300gg-111(a)(1)(C)(iv) ...............................................................................15

§ 300gg-111(a)(5)(C)(ii) ..................................................................................5

§ 300gg-111(a)(5)(D) ......................................................................................5

§ 300gg-111(c)(1) ........................................................................................7, 20

§ 300gg-111(c)(2)(A) ......................................................................................6

§ 300gg-111(c)(5)(C) ......................................................................................5

§ 300gg-111(c)(5)(C)(i) ...............................................................................15, 18

§ 300gg-111(c)(5)(C)(i)(II) ...............................................................................19

§ 300gg-111(c)(5)(C)(ii) ..............................................................................15, 16

§ 300gg-111(c)(5)(D) .....................................................................................15

**Regulations and Federal Registers**

42 C.F.R. § 149.140(a)(4) ....................................................................................6

Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36,872 (July 13,
2021) ...................................................................................................................6

Requirements Related to Surprise Billing; Part II, 86 Fed. Reg. 55,980 (Oct. 7,
2021) ................................................................................................6, 18, 19, 23

**TABLE OF AUTHORITIES (cont.)**                                    **Page(s)**

**Other Authorities**

**Proposed Legislation**

Ban Surprise Billing Act, H.R. 5800, 116th Cong. § 2, 4 (2019-2020)..........................................15

Consumer Protection Against Surprise Medical Bills Act of 2020, H.R. 5826, 116th Cong. § 3 (2019-2020)....................................................................................15

Lower Health Care Costs Act, S. 1895, 116th Cong. (2019-2020) ...............................................11

**Petitions to Congress**

Letter from America's Essential Hosps. *et al.*, to Leader Mitch McConnell *et al.* (July 30, 2020) ............................................................................................................12

Letter from Bruce Siegel, MD, MPH, Pres. & CEO, America's Essential Hosps., to Rep. Frank Pallone, Jr. & Rep. Greg Walden, p.3 (May 28, 2019)....................................13

Letter from Fed'n Am. Hosps., to Chairman Pallone, Jr. & Ranking Mem. Walden, House Comm. Energy & Commerce, p.2 (May 28, 2019). .............................11, 12

Letter from Karen Fisher, Chief Pub. Policy Officer, AAMC, to Sen. Lamar Alexander & Sen. Patty Murray, p.3 (June 7, 2019), , *at* https://www.aamc.org/media/13911/download?attachment. .................................................14

Letter from Rep. Pallone, Chairman, House Energy & Commerce Comm. & Sen. Murray, Chair, Senate HELP Comm., to Sec'y Becerra *et al.*, p.2 (Oct. 20, 2021) ...........................................................................................................18, 19

Letter from Rep. Richard E. Neal, Chairman & Rep. Kevin Brady, Ranking Member, Comm. Ways & Means, to Sec'y Becerra *et al.*, p.2 (Oct. 4, 2021). .......................17

Letter from Rep. Robert C. "Bobby" Scott, Chairman & Rep. Virginia Foxx, Ranking Member, House Comm. Educ. & Labor, to Sec'y Walsh *et al.* (Nov. 19, 2021). ............................................................................................17, 18, 19

Letter from Rep. Thomas R. Suozzi *et al.*, to Sec'y Becerra *et al.* (Nov. 5, 2021). ...............17, 18

Statement of the Children's Hospital Association, *Lower Health Care Costs Act: Before the S. Comm. on Health, Edu., Labor & Pensions*, 116th Cong. (2019-2020). ........................................................................................................13, 14

**Statements of Legislators**

House Committee on Energy & Commerce, Press Release, Congressional Committee Leaders Announce Surprise Billing Agreement (Dec. 11, 2020) .................5, 6, 10

**TABLE OF AUTHORITIES (cont.)**                    **Page(s)**

Press Release, Sen. Cassidy, Cassidy, Bipartisan Colleagues Release Draft
    Legislation to End Surprise Medical Bills (Sep. 18, 2018). ...................................................10

Draft Legislation to End Surprise Medical Bills (discussion draft accompanying
    Press Release). .............................................................................................................10

Statement of Sen. Lamar Alexander, Lower Health Care Costs Act, S.1895, 116th
    Cong. (2019). ................................................................................................................11

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Rule 7(o)(5) of this Court and Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, the following is disclosed concerning *amici curiae*:

The Federation of American Hospitals ("FAH") is a nonprofit trade association and has no parent company, and no publicly held company holds more than a ten percent interest in FAH.

The Association of American Medical Colleges ("AAMC") is a nonprofit association and has no parent company, and no publicly held company holds more than a ten percent interest in AAMC.

America's Essential Hospitals is a nonprofit trade association and has no parent company, and no publicly held company holds more than a ten percent interest in the organization.

The Catholic Health Association of the United States ("CHA") is a nonprofit association and has no parent company, and no publicly held company holds more than a ten percent interest in the organization.

The National Association of Children's Hospitals d/b/a/ the Children's Hospital Association is a nonprofit trade association and has no parent company, and no publicly held company holds more than a ten percent interest in the organization.

/s/ Katrina A. Pagonis
HOOPER, LUNDY & BOOKMAN, P.C.
Katrina A. Pagonis (Cal. Bar. No. 262890)
101 Montgomery Street
11th Floor
San Francisco, CA 94104
Tel: (415) 875-8500
Fax: (415) 875-8519
kpagonis@health-law.com

Sven C. Collins (Colo. Bar No. 30890)
999 18th Street
Suite 3000
Denver, CO 80202
Tel.: (720) 687-2850
Fax: (202) 580-7719
scollins@health-law.com

*Counsel for Amici Curiae*

## STATEMENT OF IDENTITY AND INTERESTS OF *AMICI* AND AUTHORITY TO FILE[1]

Amici are five national associations representing hospitals and health care systems in the United States: the Federation of American Hospitals, the Association of American Medical Colleges, America's Essential Hospitals, the Catholic Health Association of the United States, and the Children's Hospital Association.

The Federation of American Hospitals is the national representative of more than 1,000 leading tax-paying hospitals and health systems throughout the United States. Its members include teaching and non-teaching, acute, inpatient rehabilitation, behavioral health, and long-term care hospitals. They provide a wide range of acute, post-acute, emergency, children's, cancer care, and ambulatory services. These tax-paying hospitals account for nearly 20 percent of U.S. hospitals and serve their communities proudly while providing high-quality, affordable health care to their patients. Dedicated to a market-based philosophy, the Federation provides representation and advocacy on behalf of its members to Congress, the Executive Branch, the judiciary, media, academia, accrediting organizations, and the public.

The Association of American Medical Colleges ("AAMC") is a nonprofit association representing all 155 accredited U.S. medical schools; approximately 400 teaching hospitals and health systems; and more than 70 academic societies. Through these institutions and organizations, the AAMC leads and serves America's medical schools and teaching hospitals and the millions of individuals employed across academic medicine, including more than 186,000 faculty members, 94,000 medical students, 145,000 resident physicians, and 60,000 graduate

---

[1] Counsel of record for each party has provided written consent to the filing of this brief. No counsel for any party has authored this brief in whole or in part, and no person or entity, other than amici or their counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

students and postdoctoral researchers in the biomedical sciences.  These teaching hospitals and physicians deliver care to the most complex and vulnerable patient populations, many of whom require highly specialized care which often is not available elsewhere.

America's Essential Hospitals is a champion for hospitals and health systems dedicated to high-quality care for all, including the most vulnerable.  Filling a vital role in their communities, its more than 300 member hospitals provide a disproportionate share of the nation's uncompensated care, and three-quarters of their patients are uninsured or covered by Medicare or Medicaid.  Member hospitals provide state-of-the-art, patient-centered care while operating on thin margins—2.9 percent on average.  Essential hospitals are committed to serving all people, regardless of income or insurance status. Their patients face sociodemographic challenges to accessing health care, including poverty, homelessness, language barriers, and low health literacy.  These circumstances compound essential hospitals' challenges and strain their resources, requiring flexibility to ensure they are not unfairly disadvantaged for serving marginalized patients and can continue to provide vital services in their communities.

The Catholic Health Association of the United States ("CHA") is the national leadership organization of the Catholic health ministry, representing the largest not-for-profit provider of health care services in the nation.  The Catholic health ministry is comprised of more than 2,200 Catholic health care systems, hospitals, long-term care facilities, service providers and organizations.  Its member hospitals include critical access hospitals, trauma centers, hospitals with violence prevention programs, hospitals providing palliative care, and hospitals with obstetric services.  Almost 30 percent of those hospitals are in rural areas.  The goal of CHA is to assist Catholic providers in providing care for peoples and communities across the United States, with special attention to those who are poor, underserved, and most vulnerable.

The Children's Hospital Association is the national voice of children's hospitals, representing more than 220 children's hospitals dedicated to the health and well-being of our nation's children. Children's hospitals advance child health through innovations in the quality, cost and delivery of care—regardless of payer—and serve as a vital safety net for uninsured, underinsured and publicly insured children.  Children's hospitals are regional centers for children's health, providing highly specialized pediatric care across large geographic areas and facilitating national collaborative and research efforts to benefit the nation's children.

*Amici*'s members are directly impacted by the nation's healthcare laws, including those that alter or jeopardize their relationships with private health plans and health insurance issuers (collectively "insurers"), which in turn will affect patient access to care.  The No Surprises Act addresses the problem of surprise bills sent to insured patients for out-of-network emergency services and certain non-emergency services performed by out-of-network providers at in-network facilities.  During the two years that Congress negotiated surprise billing legislation, *Amici* consistently expressed their support for protecting patients from these "surprise bills," but cautioned against proposals that would have established a fixed reimbursement methodology or benchmark for out-of-network services.  Approaches that erode insurer-provider negotiations through default out-of-network rates disrupt incentives for insurers to create comprehensive networks and thereby risk impeding patients' access to needed care.  The No Surprises Act adopted by Congress follows this approach—providing financial protection to the patient while creating a neutral and balanced dispute resolution process for insurers and providers.

*Amici* submit this brief in support of Plaintiffs' lawsuit because it seeks to restore the neutral, balanced independent dispute resolution ("IDR") process that Congress mandated for resolving disputes over the appropriate rate for out-of-network care.  Restoration of the

statutorily mandated, neutral dispute resolution process is both legally required and essential to our health care system.  The invalid IDR process that the defendant agencies have put into place will ultimately harm patients by incentivizing insurers to create narrower provider networks, undervaluing the services of specialized and essential hospitals, reducing providers' ability to negotiate fair reimbursement, and impeding access to care, particularly in underserved communities.

**ARGUMENT**

## I.   <u>Introduction</u>

*Amici* strongly support the No Surprises Act *as enacted*.  The Act ensures that patients have the equivalent of in-network coverage and cost-sharing obligations in circumstances where the patient has no reasonable control over whether care is furnished by out-of-network facilities or providers, and it does so in a manner that does not disrupt market dynamics for in-network care or erode patient access to robust provider networks.

This balance in the No Surprises Act was produced through robust debate and compromise and stakeholder engagement that considered and ultimately rejected rate-setting or benchmarking approaches to out-of-network payments.  When announcing the compromise legislation after two years of hearings and negotiations, the drafters explained the Act "takes patients out of the middle, and allows health care providers and insurers to resolve payment disputes" in an IDR process where the neutral arbiter "is *required* to consider the median in-network rate, information related to the training and experience of the provider, the market share of the parties, previous contracting history between the parties, complexity of the services provided, and any other information submitted by the parties."  House Committee on Energy & Commerce, Press Release, Congressional Committee Leaders Announce Surprise Billing Agreement (Dec. 11, 2020), *at* <u>https://energycommerce.house.gov/newsroom/press-</u>

releases/congressional-committee-leaders-announce-surprise-billing-agreement (emphasis added).

The Department of the Treasury, Department of Labor, and Department of Health and Human Services (the "Departments"), however, have promulgated IDR regulations that upend Congress' considered approach for payment determinations in IDR.  The Departments' interim final rules (the "Rules") convert the insurer's median in-network rate, known as the qualifying payment amount ("QPA"), into a *de facto* payment benchmark that all but eliminates the importance of the full range of circumstances Congress explicitly listed as relevant to the value of the care furnished.  *See* Requirements Related to Surprise Billing; Part II, 86 Fed. Reg. 55,980 (October 7, 2021).  The Departments' Rules require the arbiter to presume that the QPA represents the appropriate amount of payment.  *Id*. at 55,996-98.  The Rules openly acknowledge that this QPA presumption will drive payment for out-of-network care to the QPA.  *Id*. at 55,996.  But the QPA is not designed to represent the market value of services or reflect the cost of care.

In an effort to buttress the QPA presumption, the Departments have advanced several of their own policy goals.  But it is not this Court's responsibility to evaluate the soundness of agency policy, as "[a]n agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms."  *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 325 (2014).  Instead, the question for this Court is whether the Departments have stayed within the statutory limits set by Congress.  *See id.* at 326 ("Agencies . . . must always give effect to the unambiguously expressed intent of Congress.") (internal quotation omitted).  As explained above and in greater detail below, there were many competing bills, reflecting many different preferred policy approaches for addressing surprise billing and the resolution of disputes between insurers

and health care providers.  The final statute that emerged from this legislative process may not

have been the Departments' favored policy, but it is the law.

Congress, in light of considered debate and testimony on the adverse consequences of

benchmarking proposals, did not leave the door open for the Departments to adopt the QPA as

the presumptive rate.  If insurers can count on the QPA being the payment amount, they have

little incentive to offer anything else during the statutory "open negotiation" process that

precedes IDR[2] or to negotiate fair in-network contracts with hospitals and physicians that treat

complex, high-cost cases.  This unintended additional bargaining leverage for insurers will result

in fewer in-network contracts, limiting patients' access to specialty and subspecialty care,

increasing the volume of out-of-network care, delaying care, and ultimately increasing costs due

to poorer outcomes.  This is particularly true for the many out-of-network situations that involve

care that is not captured by the QPA.  For example, the QPA does not factor in whether the

patient was treated in a setting that provides more complex and highly specialized care than the

average in-network hospital, such as a children's hospital, a teaching hospital, or a rural referral

center.  42 C.F.R. § 149.140(a)(4) (defining *all hospitals* as "facilit[ies] of the same or similar

facility type" for purposes of the QPA); Requirements Related to Surprise Billing; Part I, 86 Fed.

Reg. 36,872, 36,891-92 (July 13, 2021) (declining to differentiate between teaching and non-

teaching hospitals in QPA calculations).  Nor does it factor in the quality of care provided by the

hospital, the complexity of the individual patient's care, or the hospital's efforts to improve

patients' access to care by seeking in-network status.[3]  Congress explicitly directed that these

---

[2] IDR is only available when the parties fail to determine the amount of payment for an item or
service during a statutory, 30-day open negotiation period.  42 U.S.C. § 300gg-111(c)(1).

[3] The QPA calculation also does not fully account for actual in-network rates because the
Departments' QPA-calculation rules exclude case rate agreements, shared savings, and other

circumstances and others be considered in the IDR process, but the Departments' regulations all but eliminate them.

As the Plaintiffs' supporting declarations demonstrate, the QPA presumption is already being used by insurers as leverage to demand that network hospitals accept lower contracted rates or face exclusion from the insurer's network.  *See* Decl. of Catherine M. Rossi ¶¶ 24-26, ECF No. 3-2; Decl. of Bethany Sexton ¶¶ 22-25, ECF No. 3-1.  The Departments' Rules allow insurers that terminate providers offering sophisticated and specialized care to benefit from the QPA presumption notwithstanding the significant harms network exclusions inflict on patients. Without in-network benefits for non-emergency care at the hospital, for example, patients may delay care until the point of a medical emergency and may forego needed follow-up care following an emergency admission.

Accordingly, the Court should rule in favor of the plaintiffs and stay the portions of the Departments' Rules that make the QPA the presumptive payment amount in the IDR process, so that the appropriate payment amount is determined based on the factors Congress expressly directed the arbiter to consider.

## II.    The No Surprises Act's legislative history shows that Congress rejected the benchmarking approach that the Departments have adopted

*Amici* agree with Plaintiffs that the provisions in the Rules that make the QPA (generally the median contracted rate) the presumptive payment amount for IDR determinations are invalid for the simple reason that they find no support in—and directly contradict—the plain language of the No Surprises Act.  This conclusion is reinforced by examination of the No Surprises Act's

---

valued-based payment arrangements.  86 Fed. Reg. at 36,893-94, 39,976; 42 C.F.R. § 149.140(b)(2)(iv) (excluding "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments" used in network agreements from the QPA calculation).

legislative history.  Congressional working groups, Committees, and leadership initially considered proposed legislation that would have benchmarked out-of-network payments to the insurer's median contracted rates in a manner similar to the Departments' QPA presumption. However, after significant testimony demonstrating that such rate setting or benchmarking would hurt, not help, patients and providers, Congress ultimately rejected that approach.  Instead, as part of a bipartisan, bicameral compromise, Congress explicitly mandated a process that requires the IDR entity to consider multiple circumstances that are relevant to determining fair and reasonable payment for noncontracted care, only one of which is the QPA.  The No Surprises Act's legislative history conclusively demonstrates that the Departments' QPA presumption thwarts congressional intent.

       A.    <u>Initial proposals for rate-setting and benchmarking were met with stakeholder input that rate setting would harm patients and providers.</u>

Congressional committees, leaders, and bipartisan working groups spent over two years consulting with stakeholders on surprise billing issues, weighing policy considerations, and reaching an ultimate compromise.  This compromise, on the one hand, protects patients from surprise bills and financial uncertainty while, on the other, leaving insurers and providers to resolve their payment disputes first through open negotiation and then, if necessary, through an IDR process that considers the full range of circumstances presented by the parties (excluding three prohibited factors).  House Committee on Energy & Commerce, Press Release, Congressional Committee Leaders Announce Surprise Billing Agreement (Dec. 11, 2020), *at* https://energycommerce.house.gov/newsroom/press-releases/congressional-committee-leaders-announce-surprise-billing-agreement.

Notably, early draft legislation released by a bipartisan, Senate working group in 2018 would have set an out-of-network rate at the greater of the median in-network rate or 125 percent

of the average allowed amount for the service.  Press Release, Sen. Cassidy, Cassidy, Bipartisan

Colleagues Release Draft Legislation to End Surprise Medical Bills (Sep. 18, 2018), *at*

https://www.cassidy.senate.gov/newsroom/press-releases/cassidy-bipartisan-colleagues-release-

draft-legislation-to-end-surprise-medical-bills.[4]  Over the next two years, key Senate and House

Committees—including the House Committee on Energy & Commerce, the House Education &

Labor Committee, the House Committee on Ways and Means, and the Senate Health, Education,

Labor and Pensions ("HELP") Committee—considered and held hearings on a range of

proposals and bills, released discussion drafts, solicited stakeholder comments, and introduced

proposed bills, many of which included benchmarking or rate-setting for out-of-network rates.

For example, the first legislation proposed by the House Committee on Energy & Commerce

took the approach of setting the out-of-network payment based on the "recognized amount" (the

median contracted rate).  *See* H.R. 3630, 116th Cong. § 2(a)(1)(C)(vii) (requiring the insurer to

pay "the recognized amount" remaining after the patient's cost-sharing amount), § 2(a)(3)

(defining "recognized amount") (2019-2020).  The Senate HELP Committee's Lower Health

Care Costs Act, S. 1895, 116th Cong. (2019-2020) (*available at*

https://www.congress.gov/bill/116th-congress/senate-bill/1895/text), would have likewise

benchmarked insurer's payments for out-of-network services to median in-network rates because

"the benchmark solution is the most effective at lowering health care costs."  165 Cong. Rec.

S4622, S4623 (daily ed. June 27, 2017) (statement of Sen. Alexander), *available at*

---

[4] The discussion draft that accompanied this press release is available at
https://www.cassidy.senate.gov/imo/media/doc/Discussion%20Draft-
%20Protecting%20Patients%20from%20Surprise%20Medical%20Bills%20Act.pdf.  Section
2(a) would have amended 42 U.S.C. § 300gg-19a to add subsection (b)(4), setting the amount to
be paid by the insurer.

https://www.govinfo.gov/content/pkg/CREC-2019-06-27/pdf/CREC-2019-06-27-pt1-PgS4622.pdf.  These proposals were met with strong opposition.

In letters and committee hearings on various iterations of surprise billing proposals,[5] stakeholders raised concerns that rate setting or benchmarking insurers' obligations based on their median contracted rates would "upend private payment negotiations between providers and health plans with ramifications far beyond the narrower issue the legislation seeks to cure." Letter from Fed'n Am. Hosps., to Chairman Pallone, Jr. & Ranking Mem. Walden, House Comm. Energy & Commerce, p.2 (May 28, 2019), *at* https://www.fah.org/wp-content/uploads/2020/07/EC_Surprise_Billing_Discussion_Draft_-_FAH_Response.pdf.  The Federation of American Hospitals ("FAH") explained to the leadership of the House Committee on Energy & Commerce that rate-setting "disincentivizes plans to create comprehensive networks – contrary to the preferred outcome, and harmful to patients."  *Id.*  Federal rate setting would "be used as inappropriate leverage and have outsized influence not only on the small part of the market the legislation intends to address [*i.e.*, emergency services] but on in-network payment and contracting across the country."[6]  *Id.*  Instead, the FAH urged the committee to consider "other market-based solutions" for determining out-of-network payment rates, including

---

[5] The Senate HELP Committee alone reported that it received over 800 comments from stakeholders regarding its Lower Health Care Costs Act.  165 Cong. Rec. S4622, S4623 (daily ed. June 27, 2017 (statement of Sen. Alexander).

[6] Dr. Sheriff Zaafran of Physicians for Fair Coverage similarly testified about the potential unintended harms of a benchmark payment approach: "[T]he experience in California shows that a benchmark approach does not work.  The law has had unintended consequences, resulting in insurers refusing to renew longstanding contracts or offering significantly reduced rates that undermine good faith contracts.  Insurers in the state now have little incentive to contract with physicians."  *No More Surprises: Protecting Patients from Surprise Medical Bills, Subcomm. on Health of the H. Comm. on Energy & Commerce*, 116th Cong. at 35 (statement of Dr. Sheriff Zaafran, Chair, Physicians for Fair Coverage).

arbitration by a neutral third party—the approach Congress ultimately took in the No Surprises Act.

As Congress continued to consider surprise billing legislation, *Amici* and others repeatedly expressed their support for federal legislation that protects patients by limiting their responsibility to in-network cost-sharing without engaging in rate setting or benchmarking. *Amici* and others wrote to congressional leadership on July 30, 2020, stating that a surprise billing solution "must provide a pathway for health care providers and health insurers to resolve out-of-network disputes in a fair and unbiased way."  Letter from America's Essential Hosps. *et al.*, to Leader Mitch McConnell *et al.* (July 30, 2020), *at* https://www.childrenshospitals.org/-/media/Files/CHA/Main/Issues_and_Advocacy/Key_Issues/Exchanges_and_Private_Coverage/Letters_and_Testimony/2020/HALO_surprise_billing_congressional_letter_073020.pdf.  They again warned of the risks of benchmarking:

> Legislative proposals that would dictate a set payment rate for unanticipated out-of-network care are neither market-based nor equitable, and do not account for the myriad inputs that factor into payment negotiations between insurers and providers. These proposals will only incentivize insurers to further narrow their provider networks and would also result in a massive financial windfall for insurers.

*Id.*

*Amici* and others warned that hospitals offering specialized services and the communities that depend on those services are particularly at risk under benchmarking proposals.  For example, America's Essential Hospitals, in a letter to the House Committee on Energy & Commerce, stated that a "median payment rate . . . could result in underpayment of services to hospitals that have higher costs" and that disproportionately serve "the uninsured and patients with complex clinical and social needs."  Letter from Bruce Siegel, MD, MPH, Pres. & CEO, America's Essential Hosps., to Rep. Frank Pallone, Jr. & Rep. Greg Walden, p.3 (May 28, 2019),

*at* https://essentialhospitals.org/wp-content/uploads/2019/06/FINAL-AEH-CommentLetter-NoSurprisesAct_5.28.19.pdf. "Essential hospitals provide the full spectrum of critical health care services to their communities while facing challenging financial situations. Instituting a median payment rate would undervalue these critical services on which patients rely." *Id.* These services include trauma care, neonatal and burn care, and wraparound services that target social determinants of health. *Id.* The letter goes on to warn that setting a median payment rate—in addition to undervaluing the services upon which these underserved communities rely—"may result in perverse incentives for insurers to further narrow their networks," which would reduce patients' access to "critical health care services by excluding higher-cost providers . . . that offer a full spectrum of lifesaving health care services." *Id.*

The Children's Hospital Association, in a statement submitted for the Senate HELP Committee's hearing on the Lower Health Care Costs Act, similarly warned against the harms of rate-setting strategies for children's hospitals, which "advance child health through innovation in the quality, cost and delivery of care—regardless of payer—and serve as a vital safety net for uninsured, underinsured and publicly insured children." *Lower Health Care Costs Act: Before the S. Comm. on Health, Edu., Labor & Pensions*, 116th Cong. (2019) (Statement of the Children's Hospital Association), *at* https://www.childrenshospitals.org/-/media/Files/CHA/Main/Issues_and_Advocacy/Key_Issues/population_health/CHA_-Statement_Record_HELP-Hearing_061819.pdf. In particular, a rate-setting approach "could have unintended consequences, especially as it relates to ensuring [children's] access to comprehensive pediatric services." Therefore, the Children's Hospital Association urged the Committee to "ensure patient access to care and comprehensive networks" and "focus on

preserving the role of private negotiation between provider and insurers to avoid incentivizing the creation of narrow networks." *Id.*

The Association of American Medical Colleges ("AAMC") also explained that benchmarking to a median in-network rate "would destabilize academic medicine and workforce training by allowing insurers to use benchmark payments as leverage to pay academic medical centers less, or to justify cutting them out of networks completely." Letter from Karen Fisher, Chief Pub. Policy Officer, AAMC, to Sen. Lamar Alexander & Sen. Patty Murray, p.3 (June 7, 2019), *at* https://www.aamc.org/media/13911/download?attachment. Benchmarking strategies "undermine the fundamental practice of private negotiation" by creating "disincentiv[es for] insurers to negotiate with providers." This could ultimately "lead to narrow networks – which oftentimes limit patient access to needed health care services and providers," including teaching hospitals. AAMC's member teaching hospitals are critical components of the health care system, providing the majority of pediatric intensive care beds, Level 1 trauma centers, and National Cancer Institute-designated cancer treatment centers. *Id.*

After receiving this and other feedback, the legislators revised their respective proposals. One of these proposals, from the House Committee on Education and Labor, made the median contracted rate the default payment amount for out-of-network care but added an IDR process with the option for baseball style arbitration for disputes over items and services with a median contracted rate above a certain dollar amount. *See* Ban Surprise Billing Act, H.R. 5800, 116th Cong. § 2, 4 (2019-2020). In contrast, the proposal from the House Committee on Ways and Means *removed* any default payment amount, leaving the payment instead to be determined through negotiation or baseball style arbitration. Consumer Protection Against Surprise Medical Bills Act of 2020, H.R. 5826, 116th Cong. § 3 (2019-2020).

**B.**   In the final No Surprises Act, Congress eliminated benchmarking or preference for median contracted rates to determine the payment amount.

The final compromise legislation that Congress adopted in the No Surprises Act, reported out of the House Committee on Ways and Means, made two significant changes to the IDR provisions for determining the appropriate payment for out-of-network care.  *First*, Congress excluded benchmarking of insurer payments, both by requiring that the insurer make an "initial payment" to the facility or provider of an unspecified amount, 42 U.S.C. § 300gg-111(a)(1)(C)(iv)), and by specifically setting forth the factors an arbiter "shall" consider without prescribing weights to any single factor, 42 U.S.C. § 300gg-111(c)(5)(C)(i).  *Second*, it expanded the list of additional circumstances on which the parties can submit information and that the IDR entity is required to consider in determining the payment amount.[7]  42 U.S.C. § 300gg-111(c)(5)(C)(ii).  Under the plain language of the enacted statute, the QPA is the sole basis for determining the patient's cost-sharing amount where Federal law applies, but it is only one of the many circumstances that the IDR arbiter "shall consider."  *Id.*

Thus, after a lengthy process of legislative compromise, Congress *rejected* proposals that would have benchmarked initial or final payment amounts owed by insurers to out-of-network providers.  Rather, Congress opted to protect the patient while allowing insurers and providers to resolve payment disputes through a neutral arbitration process.  This strategy involves the creation of two separate terms defining distinct payment amounts: (1) the "recognized amount," which is based on the QPA and is used to expeditiously determine the patient's cost-sharing

---

[7] The final legislation requires the arbiter to consider all submitted information (with the exception of information on the three prohibited considerations enumerated in 42 U.S.C. § 300gg-111(c)(5)(D)).  Specifically, the arbiter "shall consider" the QPA, information submitted on any of the five additional circumstances enumerated in 42 U.S.C. § 300gg-111(c)(5)(C)(ii), information requested by the arbiter, and "any additional information" that a party submits relating to either party's offer.  42 U.S.C. § 300gg-111(c)(5)(C)(i).

obligations and (2) the "out-of-network rate," which is based on all the relevant facts and circumstances and is used to determine the insurers' payment to the provider.  42 U.S.C. § 300gg-111(a)(1)(C)(iii), (a)(1)(C)(iv), (a)(3)(H), (a)(3)(K), (c).  In furtherance of this approach, the statute sets forth fairly detailed requirements for calculating the QPA so that the recognized amount can be readily ascertained and the patient's cost-sharing obligations promptly finalized.  Once the patient's obligation is resolved, if the provider or facility and insurer disagree on the appropriate amount of total payment, they can proceed to a more nuanced and complete evaluation of the appropriate payment amount in open negotiations. Then, if necessary, the parties can obtain a determination of the payment amount at IDR based on all the statutory factors, of which the QPA is only one.

The plain language of the statute demonstrates that Congress did not intend the median contracted rate to be used as a benchmark or otherwise be given extra weight in the IDR process, and this reading is borne out by the legislative history as described above.  Indeed, in a letter to the Departments objecting to the Rules, the Chairman and Ranking Member of the House Committee on Ways and Means explained that "Congress deliberately crafted the law to avoid any one factor tipping the scales during the IDR process."  Letter from Rep. Richard E. Neal, Chairman & Rep. Kevin Brady, Ranking Member, Comm. Ways & Means, to Sec'y Becerra *et al.*, p.2 (Oct. 4, 2021), *available at* https://www.gnyha.org/wp-content/uploads/2021/10/2021.10.04-REN-KB-Surprise-Billing-Letter80.pdf.  They further explained, "The law Congress enacted directs the arbiter to consider all of the factors without giving preference or priority to any one factor—that is the express result of substantial negotiation and deliberation among those Committees of jurisdiction, and reflects Congress's intent to design an IDR process that does not become a de facto benchmark." *Id*.  Against this

backdrop, the Departments' suggestion that Congress actually intended the median contracted rate to be the primary factor is not sustainable.  These views were echoed by more than 150 members of Congress, who explained that "the parameters of the IDR process in the [Rules] . . . do not reflect the way the law was written, do not reflect a policy that could have passed Congress, and do not create a balanced process to settle payment disputes."  Letter from Rep. Thomas R. Suozzi *et al.*, to Sec'y Becerra *et al.* (Nov. 5, 2021), *available at* https://wenstrup.house.gov/uploadedfiles/2021.11.05_no_surprises_act_letter.pdf.

Even supporters of the Department's approach fail to identify statutory language or legislative history supporting the QPA presumption.  A letter from the Chairman and Ranking Member of the House Committee on Education and Labor supporting the QPA presumption merely repeats the Departments' meritless arguments, *see* Letter from Rep. Robert C. "Bobby" Scott, Chairman & Rep. Virginia Foxx, Ranking Member, House Comm. Educ. & Labor, to Sec'y Walsh *et al.* (Nov. 19, 2021), *available at* https://edlabor.house.gov/imo/media/doc/chairman_scott__ranking_member_foxx_re_surprise_billing_protections.pdf ("Reps. Scott & Foxx Ltr.").  For example, this letter suggests that the "centrality of the QPA" is clear from the "extensive detail regarding its calculation and application" in the statute.  *Id.* at p.3.  But this suggestion—also made by the Departments, 86 Fed. Reg. at 55,996—fails to consider the only explanation that is consistent with the statutory text and legislative history, namely that the QPA must be ascertained quickly and in a replicable and reliable fashion by insurers to ensure that the patient's financial obligation is promptly determined and resolved.  The No Surprises Act provides that the patient's "cost-sharing requirement is calculated as if the total amount that would have been charged for such services by such participating provider or participating emergency facility were equal to the recognized

amount . . . for such services, plan or coverage, and year," and that the recognized amount is the QPA in the absence of controlling State law.  42 U.S.C. § 300gg-111(a)(1)(C)(iii), (3)(H)(ii). The letter also characterizes some of the statutorily enumerated considerations as "relatively minor items (such as the experience or educational credentials of a provider)" and indicated that other factors "are generally reflected in the underlying QPA (such as patient acuity or the complexity of furnishing an item or service)."  Reps. Scott & Foxx Ltr. at p.3.  These considerations, however, are plainly relevant to assessing the final payment because they get to the facts and circumstances of the actual care provided by a particular provider to a specific patient.  Moreover, the statute itself does not in any way suggest limits on the arbiter's consideration of these circumstances; to the contrary, it mandates that the arbiter "shall consider" information presented on these and other listed circumstances.  42 U.S.C. § 300gg-111(c)(5)(C)(i).

House Energy & Commerce Committee Chairman Frank Pallone, Jr. and Senate HELP Committee Chair Patty Murray also wrote in support of the QPA presumption, raising similarly meritless arguments.  Letter from Rep. Pallone, Chairman, House Energy & Commerce Comm. & Sen. Murray, Chair, Senate HELP Comm., to Sec'y Becerra *et al.*, p.2 (Oct. 20, 2021), *at* https://www.help.senate.gov/imo/media/doc/Pallone%20Murray%20No%20Surprises%20Act% 20IFR%20Comment%20Ltr%2010.20.212.pdf ("Rep. Pallone & Sen. Murray Ltr.").  They contend that "[t]he law designates the QPA as the only factor that must be submitted and considered without qualification in every dispute under consideration by the IDR entity."  The observation that the QPA must be submitted, however, is an unremarkable reflection of the fact that the QPA is necessarily calculated in every case submitted to IDR (as discussed, it is the basis for calculating the patient's cost-sharing amount) and the other relevant circumstances will vary

between cases.  The statute appropriately leaves insurers and providers free to identify and submit the relevant information supporting their offer, including information on any of the enumerated circumstances.  But, once submitted, this information is on statutorily equal footing with the QPA because the same instruction (the arbiter "shall consider") applies uniformly to each of the permissible considerations.[8]

This letter also suggests that the QPA presumption is appropriate because it "serves to increase the predictability of IDR outcomes," *id.* at p.3; *see also* 86 Fed. Reg. at 55,996 (same), but nothing in the statute or the legislative history supports this outsized focus on predictability. Again, the detailed rules for calculating the QPA reflect the intent to create predictability for patients with respect to their cost-sharing obligations.  But Congress ultimately rejected a benchmark methodology for determining the insurer's payment obligation in favor of one in which the arbiter "shall consider" all the statutory factors.  The No Surprises Act also requires that insurer-provider payment disputes proceed through a 30-day open negotiation period and only permits the submission of payment disputes to IDR in the case of "failed open negotiations." 42 U.S.C. § 300gg-111(c)(1).  The QPA presumption runs counter to this statutory requirement, eliminating any incentive for insurers to offer any amount greater than the QPA, even when the actual circumstances demonstrate a higher value for the care.

In the end, these letters supporting the QPA presumption reflect their authors' sponsorship of bills containing benchmarking proposals that Congress ultimately rejected.  *See*

---

[8] Along similar lines, it is of no moment that the QPA must be considered "without qualification." 42 U.S.C. § 300gg-111(c)(5)(C)(i)(II) specifies that the information considered by the arbiter cannot include any of the three prohibited factors (*e.g.*, public payer rates) set forth in subparagraph (D).  The QPA, by definition, is not and does not include any of these prohibited factors.  Thus, the absence of a similar (but wholly unnecessary) "qualification" to the arbiter's consideration of QPA in subparagraph (C)(i)(I) is simply immaterial.

H.R. 3620, 116th Cong. (2019) (Rep. Pallone); H.R. 5800, 116th Cong. (2019) (Reps. Scott & Foxx); and S. 1895 (Sen. Murray), 116th Cong. (2019).  Their later-expressed views do not change the law that Congress enacted.  Likewise, the Departments lack "the power to rewrite a statute and reshape a policy judgment Congress itself has made."  *NRDC v. Adm'r, EPA*, 902 F.2d 962, 977 (D.C. Cir. 1990) (per curiam), *vacated in part*, 921 F.2d 326 (D.C. Cir. 1991).  Yet this is exactly what the Departments have attempted to do, by replacing the statutory methodology for determining payment amounts in IDR with its QPA presumption.  This invalid attempt violates the separation of powers and should be rejected by this Court.  *See Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. at 327 ("The power of executing the laws . . . does not include a power to revise clear statutory terms . . . .") (quotation marks and internal citations omitted).

## III.   The Departments' regulations, if allowed to stand, will harm patients and providers

Plaintiffs have cogently explained and shown in their pleadings the substantial harms threatened by the unlawful QPA presumption.  It creates diminished incentives for insurers to maintain and expand provider networks, narrowing existing networks and thus providing fewer in-network choices for patients.  And it will artificially reduce insurer payments to hospitals and physicians, undermining their ability to provide the same level and range of services.  *See* Pls. Compl. ¶ 9, ECF No. 1; Pls.' Mot. for Stay Pending Judicial Review, or in the Alternative, for Summ. J. 33-39, ECF No. 3; Decl. of Bethany Sexton ¶¶ 26-30, ECF No. 3-1; Decl. of Catherine M. Rossi ¶¶ 25, 30, ECF No. 3-2.  In fact, the declarations Plaintiffs have filed with the Court show that insurers have *already* begun to exercise the leverage created by QPA presumption to demand that providers accept lower rates or face termination of their network agreements.  *See* Decl. of Catherine M. Rossi ¶¶ 24-26, ECF No. 3-2; Decl. of Bethany Sexton ¶¶ 22-25, ECF No. 3-1.  These strategies work against the goals of the No Surprises Act by reducing patients' access

to in-network services, but they are also the natural consequence of the unlawful QPA presumption adopted by the Departments.

The harms of benchmarking provider payments will be amplified in the vulnerable and needy communities served by *Amici*'s member hospitals.  These hospitals understand the importance of insurers maintaining adequate provider networks, both in terms of continuity of care and access to high-quality and often specialized care.  But the QPA presumption incentivizes insurers to either undercompensate or refuse to contract with hospitals that provide specialized services, treat more severely ill patients, or furnish other services with a value that exceeds the QPA.  And if the insurer does either, it benefits from the QPA presumption at the expense of patients that face diminished access to in-network hospital services.  This approach harms patients, who will be less likely to return for needed follow-up care following an emergency admission and may delay needed care until the point of a medical emergency.  Access to covered, in-network, non-emergency hospital services is critical to patients' wellbeing, and the QPA presumption works against network access by incentivizing the termination of essential community and specialty hospitals.

For example, children's hospitals provide vital, highly specialized pediatric care across large and varied geographic areas and are distinguished by their programming, support services, specially trained clinicians and facilities tailored specifically to serve the needs of children.  Of the hospitals in the U.S., only 2 percent are larger acute-care children's hospitals.  Under the Departments' rules, the QPA calculation will not distinguish between adult and pediatric services or facilities.  Instead, it will be based on the insurer's median in-network amount for all hospital emergency departments (adult and pediatric) in the relevant geographic area.  In some cases, the calculation will not include data from any other children's hospital given the regionalization of

pediatric specialty care.  This number will not capture the value of the unique and specialized services children's hospitals provide to their patients and their patients' families.  Although this QPA methodology may be appropriate for swiftly determining and limiting the patient's cost-sharing liability, it is plainly unrepresentative of the value or costs of care provided by the children's hospital.  Even if the IDR process is not triggered, tethering the out-of-network rate to the artificially low and non-representative QPA incentivizes insurers to demand unsustainable rate concessions in contract negotiations, jeopardizing children's access to in-network pediatric hospital care and diminishing the viability of children's hospitals.

*Amici*'s member hospitals also include rural referral centers, essential hospitals, and academic medical centers that provide their communities with highly specialized care that is often unavailable at other institutions, such as trauma centers, burn units, and neonatal services. Their patients have higher average acuity, are medically complex, and often cannot access care elsewhere.  The unintended but predictable consequences of the QPA presumption places the patients served by these hospitals at risk for diminished in-network access to care and the possibility of losing access to critical services altogether.

Every American also depends on academic medical centers, teaching hospitals, and children's hospitals continuing to invest in and pursue their missions of educating and training the next generation of physicians and allied health professionals, conducting research, and caring for their communities.  AAMC member teaching hospitals, because of their expert faculty physicians, health care teams, and cutting-edge medical technology, provide care for complex patients and often care for patients for who are unable to receive care elsewhere.  Although they comprise only 5 percent of all acute care hospitals, these teaching hospitals provide 25 percent of the nation's medical and surgical intensive care beds, 36 percent of cardiac intensive care beds,

61 percent of pediatric intensive care beds, and are home to 69 percent of all Level 1 Trauma Centers.  Teaching hospitals are established and respected regional referral centers and centers for tertiary care, provide 24/7 access to experts in medical specialties, and accept transfers of patients who are too medically complex to treat at other facilities. As a result of all these factors, major teaching hospitals often are sites for emergency treatment as they house such services as trauma centers, burn units, and inpatient psychiatric services.

The Rules, however, assure insurers that they need not pay their fair share for the additional, inherent patient-care costs associated with medical education and the associated care setting:  Unless the hospital's teaching status "was in some way critical to the delivery of the qualified IDR item or service, and not adequately accounted for in the QPA," it will not rebut the presumption in favor of the QPA. 86 Fed. Reg. at 55,998.  This approach plainly departs from Congress' instruction that the certified IDR entity "shall consider" information on the "teaching status" of the hospital.  Moreover, it jeopardizes patient access by incentivizing insurers to terminate critical providers and demand price concessions from contracted academic medical centers, teaching hospitals, and their associated teaching physicians that will not adequately account for the value they provide to patients and their communities.

In the end, the higher costs that safety net hospitals, academic medical centers, and children's hospitals frequently incur to provide vital and high-quality care, often in underserved communities, may lead to them facing exclusion from provider networks or inadequate reimbursement from insurers as a result of the Departments' Rules.  By making the QPA the *de facto* payment amount, the Departments have tipped the scales against these hospitals, putting them in an uphill and losing battle to receive fair payment, which will diminish access to care and ultimately harm the patients the No Surprises Act was intended to help.

**CONCLUSION**

The Departments' Rules upend the careful balance Congress designed for the IDR process in the No Surprises Act.  The Departments have impermissibly created a presumption—that the QPA is the appropriate out-of-network rate—that Congress rejected and eliminated from the final legislation.  This regulated process will unduly skew negotiations in favor of insurers, to the detriment of the nation's health care system.  *Amici* respectfully request that the Court issue a stay pending judicial review of the QPA presumption in the Rules, or in the alternative, grant judgment in favor of Plaintiffs, thereby restoring the neutral IDR process that Congress intended.

Dated:  December 15, 2021

/s/ Katrina A. Pagonis
HOOPER, LUNDY & BOOKMAN, P.C.
Katrina A. Pagonis (Cal. Bar. No. 262890)
101 Montgomery Street
11th Floor
San Francisco, CA 94104
Tel: (415) 875-8500
Fax: (415) 875-8519
kpagonis@health-law.com


Sven C. Collins (Colo. Bar No. 30890)
999 18th Street
Suite 3000
Denver, CO 80202
Tel.: (720) 687-2850
Fax: (202) 580-7719
scollins@health-law.com


*Counsel for Amici Curiae*